UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JENNIFER HALL, personal representative of the Estates of Joseph R. Kalister, M.D., Betty J. Kalister, and Nicole M. Kalister, et al., <br><br> Plaintiffs, <br><br> v. <br><br> HARTZELL ENGINE TECHNOLOGIES, LLC, <br><br> Defendant. | Case No. 3:17-cv-01340 <br><br> Judge William L. Campbell, Jr. <br> Magistrate Judge Alistair E. Newbern |

## MEMORANDUM ORDER

Plaintiffs Jennifer Hall and Jacquelyn Kalister have filed a motion to compel the production of certain documents by Defendant Hartzell Engine Technologies, LLC (Doc. No. 84). Defendant has responded in opposition (Doc. No. 96), and Plaintiffs have filed a reply (Doc. No. 98). For the reasons that follow, the motion to compel will be granted.

**I.     Relevant Background**

This case arises out of an airplane crash in Massachusetts that occurred on June 28, 2015, killing Joseph R. Kalister—who was piloting the private airplane—his wife Betty J. Kalister, and their daughter Nicole M. Kalister. (Doc. No. 74.) Plaintiff Hall is the representative of the Kalisters' estate, and Plaintiff Kalister—the daughter of Joseph and Betty and the sister of Nicole—is its sole beneficiary. (*Id.*) Hall and Kalister initiated this action on June 27, 2017, by filing a complaint for wrongful death against HET in the Circuit Court of Montgomery County, Alabama. (Doc. No. 1-3.) HET removed this action to the United States District Court for the Middle District of Alabama (Doc. No. 1-2). The parties later agreed to transfer venue to this

district. (Doc. No. 1.) Plaintiffs' amended complaint, filed on November 14, 2019, is the operative pleading. (Doc. No. 74.)

### A. The Amended Complaint (Doc. No. 74)

Plaintiffs allege that, as Joseph Kalister approached the destination airport on June 28, 2015, the airplane he was piloting began to experience engine problems. (Doc. No. 74.) The engine ultimately failed and the plane crashed, bursting into flames on impact and killing its three occupants. Plaintiffs state that "[t]he crash was caused by the failure of a Plane Power alternator, Model No. C28-150 . . . and its connecting components that were installed new on the subject aircraft in 2011."

Plane Power "designed, marketed, manufactured, and sold the subject alternator." Defendant had purchased Plane Power's assets, including the C28-150 alternator line, on July 17, 2014, nearly a year before the crash. Plaintiffs state that Plane Power withdrew its Federal Aviation Administration (FAA) Parts Manufacturer Approval (PMA) after the asset purchase and Defendant acquired its own PMA for the alternator on December 9, 2014. Defendant continues to manufacture and sell the Plane-Power alternators.[1]

Central to Plaintiffs' claims is the allegation that Defendant was aware of, ignored, and had the duty to correct design and manufacturing defects in the C28-150 alternator installed in the aircraft. Plaintiffs allege that those defects caused the connection between the alternator and the engine to loosen, resulting in catastrophic engine failure. Specifically, Plaintiffs allege that the design of the C28-150 alternator did not allow mechanics to attain sufficient torque values and secure the alternator to the engine adequately. The unsecured connection allowed the alternator to

---

[1] Defendant clarifies that "Plane-Power" modifies a particular kind of alternator that was originally manufactured by the Plane Power company and is now manufactured by Defendant under the same "Plane-Power" name.

loosen from the engine and shred. Plaintiffs state that Defendant "changed the design of the subject model line of alternators to include a hex socket or slot on the end of the alternator drive shaft to enable mechanics to achieve necessary torque values to effectively secure the alternator drive shaft to the engine coupling." Plaintiffs allege that Defendant knew or should have known of the need to make this design modification before the date of the crash.

Plaintiffs further allege that, when Defendant obtained a PMA for the Plane-Power C28-150 alternator, it assumed a duty under the FAA's regulatory scheme to ensure the continuing airworthiness and safety of all Plane-Power C28-150 alternators in the field, regardless of whether the alternator was manufactured by Defendant or by Plane Power before Defendant acquired that company's assets. Plaintiffs state that FAA regulations require that a new PMA holder for a previously manufactured product assume the duties of the predecessor manufacturer so that consumers who purchased a product before the corporate transfer are not left without an entity responsible for ensuring the continued safety of that product. Specifically, Plaintiffs allege that, "[a]s the PMA holder for the subject model line of C28-150 alternators and the successor and purchaser of that product line, [Defendant], as the manufacturer of those alternators, knew or should have known of all manufacturing and design defects in those alternators and the inadequacies of the warnings and instructions provided therewith . . .and failed to provide warnings and instructions to all prior users of Plane Power alternators concerning those inadequacies and defects . . . ."

Plaintiffs further allege that, as Plane Power's corporate successor in interest, Defendant had a common-law duty to warn all users of Plane Power's products of failures in those products' design or operation. (*Id.*) Again, Plaintiffs allege that Defendant should have known of any defects in the alternator and had a duty to communicate any instructions or warnings regarding the

3

alternator to its prior users and to aircraft repair facilities. Finally, Plaintiffs allege that Defendant assumed Plane Power's implied warrant of merchantability of its products and any negligence in the products' manufacture and sale. (*Id.*)

### B. Defendant's Summary Judgment Motion (Doc. No. 40)

Defendant filed a motion for summary judgment on November 9, 2018 (Doc. No. 40), in which it asserted that it cannot be held liable for the malfunction of a C28-150 alternator manufactured by Plane Power unless Plaintiffs can impute Plane Power's negligence or tortious conduct to Defendant. Defendant further argues that it is not liable to Plaintiffs under federal law because did not take on a duty when it obtained a PMA for the C28-150 alternator to ensure the continuing airworthiness of alternators that Plane Power manufactured. (*Id.*) Although Defendant agrees that, under the relevant regulations, PMA holders are responsible for "maintaining the quality system in compliance with the data and procedures approved for the PMA . . . ensuring that each PMA article conforms to its approved design and is int a condition for safe operation" and for "providing the FAA with written notification of any change in the quality system that may affect airworthiness" and reporting to the FAA any "failure, malfunction, or defect . . . ," Defendants argue that this duty is limited to products "manufactured by it."

The parties agreed that additional discovery was required for Plaintiffs to respond to Defendant's motion. (Doc. No. 45.) The Magistrate Judge held a telephone conference with counsel regarding a dispute as to the scope of the discovery that could be taken (Doc. No. 47) and, ultimately, extended the fact discovery deadline from February 15, 2019, to September 30, 2019 (Doc. No. 50). Judge Campbell denied the motion for summary judgment without prejudice to be refiled after the completion of discovery (Doc. No. 55). On September 12, 2019, counsel again moved to extend the period for fact discovery (Doc. No. 60), but could not agree on a proposed calendar that would maintain the August 11, 2020 trial date. Judge Campbell continued the trial

4

date to February 8, 2021, to allow additional time to complete discovery (Doc. No. 65) and the Magistrate Judge extended the discovery deadline to March 30, 2020 (Doc. No. 66).

Plaintiffs moved to amend their complaint on October 16, 2019 (Doc. No. 67). The Magistrate Judge granted that motion on November 14, 2019 (Doc. No. 73). Defendant answered the amended complaint (Doc. No. 77), which Plaintiffs moved to strike or dismiss in part (Doc. No. 78). Defendant moved to amend its answer on March 3, 2020 (Doc. No. 92).

On March 10, 2020—twenty days before the twice-extended discovery deadline and sixteen months after the motion for summary judgment that occasioned the need for this discovery was filed—Plaintiffs filed the present motion to compel (Doc. No. 84).

The Magistrate Judge denied Defendant's motion to amend its answer on May 8, 2020 (Doc. No. 110). On June 22, 2020, Judge Campbell granted in part and denied in part Plaintiffs' motion to strike and denied Defendant's motion for review of the denial of its motion to amend its answer (Doc. No. 119).

The parties have again moved to extend the case management calendar and to continue the trial date (Doc. No. 115). That motion will be addressed by separate order.

**II.     Legal Standard**

"[T]he scope of discovery is within the sound discretion of the trial court[.]" *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 451 (6th Cir. 2008) (first alteration in original) (quoting *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981)). Generally, Federal Rule of Civil Procedure 26 allows discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). Relevant evidence in this context is that which "'has any tendency to make a fact more or less probable than it would be without the evidence,' if 'the fact is of consequence in determining the action.'" *Grae v. Corr. Corp. of Am.*, 326 F.R.D. 482, 485 (M.D. Tenn. 2018) (quoting Fed. R. Evid. 401).

The party moving to compel discovery bears the initial burden of proving the relevance of the information sought. *See Gruenbaum v. Werner Enters., Inc.*, 270 F.R.D. 298, 302 (S.D. Ohio 2010); *see also* Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment ("A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them."). A motion to compel discovery may be filed in a number of circumstances, including when "a party fails to answer an interrogatory submitted under Rule 33[,]" or "produce documents . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B)(iii)–(iv). "[A]n evasive or incomplete disclosure, answer, or response" is considered "a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). "The court will only grant [a motion to compel], however, if the movant actually has a right to the discovery requested." *Grae*, 326 F.R.D. at 485.

**III.     Analysis**

The parties' dispute over the production of documents is, at heart, a reiteration of the claims made in the amended complaint and the legal issues raised in Defendant's motion for summary judgment. Plaintiffs assert that the documents they seek are relevant to demonstrating that Defendant acquired a duty to ensure the Plane-Power-manufactured C28-150 alternator's continued airworthiness when it acquired a PMA for that line of alternators in December 2014 and that Defendant knew before the date of the crash that the C28-150 alternator required a design modification to remain airworthy. Plaintiffs also seek documents they state are relevant to proving that Defendant had and did not meet a common-law duty to warn and instruct users of the Plane-Power alternator of any potential failures. Defendant argues that it does not have any duty to ensure the safety of any C28-150 alternator it did not manufacture and, accordingly, that none of the documents Plaintiffs request can be relevant to their claims or defenses.

Plaintiffs seek production of three categories of documents: "(1) documents concerning the Alert Service Bulletin; (2) documents concerning the addition of the 'Hex' slot onto the C28-150 alternator shaft, including all documents pertaining to 'Engineering Change Request 122180', the resulting Engineering Change Order (ECO), and the ECO for the ALU-238A; and (3) documents concerning the C28-150 'bridge stock' inventory obtained from Plane Power as part of [Defendant's] July 17, 2014 acquisition of Plane Power." (Doc. No. 85.) Plaintiffs have withdrawn their attempt to compel production of the bridge stock documents. (Doc. No. 98.) Accordingly, the Court will address the remaining two categories of documents.

### A. Documents Concerning the Alert Service Bulletin

Plaintiffs state that, on August 6, 2019, Defendant issued an Alert Service Bulletin (ASB) regarding a defect in the treads of a castellated hex nut that adversely affected the clamp force needed to secure the C28-150 alternator to an aircraft's engine. Plaintiffs state that an ASB is "the highest level of safety notification and required FAA approval as an instruction for continued airworthiness." The parties agree that the castellated hex nut addressed by this ASB was not installed in the subject plane's alternator. Plaintiffs argue that the ASB is relevant to this action, however, because it "applied to all C28-150 alternators sold by Plane Power from January 2011 until [Defendant's] purchase of Plane Power's assets in 2014" and therefore shows that, in this context, Defendant acknowledged and acted upon a duty to ensure the continued safety of C28-150 alternators it did not manufacture. Plaintiffs thus argue that Defendant should have produced documents related to the ASB in response to their Request for Production No. 43, which sought "[a]ll documents concerning [Defendant's] continuing customer support for owners of alternators sold by Plane Power prior to the July [2014] asset purchase agreement." Defendant stated that it had no documents responsive to this request.

7

To support their position that the 2019 ASB would fall into this category of documents, Plaintiffs point to the ASB's Effectivity Clause, which states that "Plane-Power alternators," including the C280-150(S), "manufactured by [Defendant] and shipped between 05 January 2011 and 21 May 2019 are affected by this [ASB]." Plaintiffs read this clause to mean that the ASB applies to all of the listed Plane-Power alternators that were manufactured by Defendant *and* all Plane-Power alternators that were shipped between January 5, 2011, and May 21, 2019, regardless of the manufacturer. To corroborate this reading, Plaintiffs point to deposition testimony from Defendant's Vice President of Engineering, Rick Quave, that the ASB applied to "alternators that were manufactured by the old Plane-Power company and shipped after January 5th, 2011." Plaintiffs also cite Quave's deposition testimony that, if Defendant received a report of a defect for an alternator manufactured by Plane Power before Defendant acquired that company's assets in 2014, Defendant would "treat it the same" as if it were Defendant's product. Finally, Plaintiffs cite Quave's assumption that the FAA ensures that a new PMA is issued when a company holding the original PMA is acquired or dissolved so that the parts in service covered by the original PMA continue to be supported and subject to safety monitoring.

Defendant argues that Plaintiffs' reading of the ASB's Effectivity Clause is "absurd" and that the ASB applies only to alternators that were both manufactured by Defendant and shipped between January 5, 2011, and May 21, 2019. To support this reading, Defendant refers to an argument made in its motion for summary judgment that, under 14 C.F.R. § 21.3, a PMA holder's duty to report any product failures, malfunctions, or defects extends only to "any product or article manufactured by it." Defendant also points to another part of Quave's deposition testimony in which he states that this ASB is "directed at the nut, which can be used on various models [of alternator] . . . It has nothing to do with the alternator's date of production. It has everything to do

with when – with when a nut . . . would have potentially supplied to [Defendant], potentially having the defect."

Whether Defendant acquired a duty to ensure the airworthiness of C28-150 alternators it did not manufacture when it acquired a PMA for that line of products is squarely presented by Defendant's motion for summary judgment, and the parties repeat and respond to some of the argument and supporting authority offered in that motion in their briefing of the motion to compel. The question of the scope of Defendant's duty is better addressed through a dispositive motion and will not be resolved in the context of a discovery dispute. The question raised by the motion to compel is whether Plaintiffs have sufficiently shown that documents concerning the ASB are relevant to their claim that Defendant held such a duty or Defendant's defense that it did not.

Plaintiffs have met that standard. The ASB's Effectivity Clause and Quave's deposition testimony, read together, create a question as to what Defendant understood to be the scope of its duty to report defects in the C28-150 alternator. The relevance of that understanding—whatever it is shown to be by these documents—to the scope of Defendant's duty may be addressed further at summary judgment or at trial.

Accordingly, Defendant shall produce documents regarding the ASB that are responsive to Plaintiffs' Request for Production No. 43 for "[a]ll documents concerning [Defendant's] continuing customer support for owners of alternators sold by Plane Power prior to the July [17] asset purchase agreement."

### B. Documents Concerning the Addition of the Hex Slot to the C28-150 Alternator Shaft

Plaintiffs next seek to compel production of documents that address the addition of a hex slot[2] to the C28-150 alternator. Plaintiffs state that Defendant issued Engineering Report (ER) 4031301 regarding adding "a hex key to the threaded end of all current production alternator shafts to facilitate a uniform process of torqueing pulley nuts" on April 15, 2013, before it acquired the C28-150 alternator line. Sometime thereafter, Defendant issued Engineering Change Request ECR-122180, which proposed adding the same type of hex slot to the C28-150 alternator shaft and referred to that hex slot being the same as "ALU-238A Rev C." Plaintiffs state that ALU-238A refers to another alternator "that has a shaft similar to the C28-150 model and is referenced in the 2013 Engineering Report 4031301." Through this lineage, Plaintiffs intend to show that Defendant knew when it issued ER 4031301 in 2013 that "the existing design of the C28-150 alternator (among others) hampered proper torqueing and that a hex slot was necessary to assist mechanics in achieving the necessary clamp-up of the alternator-engine connection to avoid catastrophic engine failure."

Plaintiffs now seek "[a]ll documents concerning [Defendant's] addition of the Hex slot on the end of the alternator shaft on the subject model alternator including, but not limited to, design drawings, engineering analysis, and engineering change orders (or equivalent)." Plaintiffs construe this request to include "documents concerning the identical alternator shaft, ALU-238A, referenced in the Engineering Change Request for the model C28-150 alternator shaft and the 2012 Engineering Report[3] that introduced the hex slot to all current alternator production models."

---

[2] This is also referred to as a "hex key" and "hex socket" in the parties' briefing.

[3] If Plaintiffs are referring to ER 4031301, they state elsewhere that report was issued in April 2013.

Plaintiffs state that this information is "directly relevant to [Defendant's] failure to warn and instruct prior to the subject crash and its decision to wait until after the subject crash to inform mechanics of the critical need for the hex slot."

Defendant responds, first, that this information is not relevant because a different entity, Continental Aerospace Technologies, "controls the instructions for the installation of the C28-150 alternators" and Defendant "cannot change the manner in which Continental instructs aircraft owners and mechanics to install C28-150 alternators on Continental engines." Defendant argues that "Plaintiffs' criticism of the instructions, warnings and/or how mechanics follow those instructions, are not properly directed to [Defendant]" because "PMA holders . . . simply direct installers to follow Continental's instructions; they do not install the couplings or supervise the mechanics who perform the installation." Defendant characterizes Plaintiff's assertion that a hex slot was necessary on the C28-150 alternator "to assist mechanics in achieving the necessary clamp-up of the alternator-engine connection to avoid catastrophic engine failure" as a "new theory of liability" that is properly directed only at Continental. Defendant also states that it has provided a redacted copy of the engineering change order that implemented ECR 122180 showing that it was originated on November 16, 2015, after the crash.

Defendant's inclusion of a hex slot on the C28-150 alternator is central to Plaintiffs' theory of liability articulated in the amended complaint: that the crash was caused by the failure of the C28-150 alternator and its connecting components installed in the plane; that Defendant knew that a C28-150 alternator could not be properly secured because of difficulty in achieving necessary torque values; that Defendant changed the design of the C28-150 alternator to include a hex slot on the alternator drive shaft to enable mechanics to achieve the necessary torque values to secure the alternator to the engine; and that Defendant had a duty, arising under federal and common law,

11

to ensure continued airworthiness of all C28-150 alternators.[4] When Defendant determined that the C28-150 alternator needed the addition of a hex slot to be installed safely is relevant to determining whether that duty began before or after the crash. The discovery that Plaintiffs seek through Request for Production No. 2—which includes documents related to the addition of a hex slot to the ALU-238A alternator and the ER 4031301—is relevant to determining what Defendant knew and when it knew it.

Accordingly, Defendant shall produce "[a]ll documents concerning Hartzell's addition of the Hex slot on the end of the alternator shaft on the subject model alternator including, but not limited to, design drawings, engineering analysis, and engineering change orders (or equivalent)."

## IV. Conclusion

For these reasons, Plaintiffs' motion to compel (Doc. No. 84) is GRANTED. Defendant shall produce the identified documents by September 30, 2020.

It is so ORDERED.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge

---

[4] Plaintiffs also claim that "the installation and inspection instructions for the subject model line of alternators were deficient." Defendant's argument that Continental is solely responsible for the instructions for installing the C28-150 alternator may be relevant to that aspect of Plaintiff's theory of liability.